UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENNIS RAY FRICK, JR.,

        Plaintiff,                        Case No. 2:12-cv-265

v.                                                    Honorable Gordon J. Quist

JEFFREY STIEVE, et al.,

        Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff presently is incarcerated at the Marquette Branch Prison but complains of events that occurred at the Ojibway Correctional Facility (OCF). In his *pro se* complaint, he sues Michigan Department of Corrections (MDOC) Chief Medical Officer Jeffrey Stieve, Chief Executive Officer of Prison Health Services, Inc., Richard Hallworth, and the following OCF employees: Warden Linda Tribley, Health Unit Manager Janet Wilbanks, Nurse Staff Supervisor Vicki Aho, Dr. Unknown Dye, Dr. Harriet Squier, Nurse and Grievance Coordinator Patricia Lamb, Bureau of Health Services J. Schad, Grievance Manager Richard Russell, Grievance Coordinator T. Hamel and Dr. Dale Asche.

Plaintiff alleges that Defendants violated his Eighth Amendment rights by failing to provide adequate care for his Polycystic Kidney Disease. Plaintiff seeks damages and equitable relief.

On August 13, 2012, the court dismissed Plaintiff's claims against Defendants Stieve, Hallworth, Tribley, Aho, Lamb, Schad, Russell and Hamel for failure to state a claim (docket #4 and

#5). Presently before the Court are the motions for summary judgment filed by Defendants Wilbanks, Asche and Squier pursuant to Fed. R. Civ. P. 56 (docket #27 and #30). The time for filing a response has passed and the matter is ready for decision.

Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendants state that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims they did not act with deliberate indifference to a serious medical need. The

Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

In support of the motion for summary judgment, Defendants attach copies of relevant portions of Plaintiff's medical record, as well as their affidavits and other related documents. Defendant Squier attests that Plaintiff has Polycystic Kidney Disease (PKD) which is an inherited condition where patients develop clusters of cysts in the kidneys. The cause of PKD is unknown, as is the cure. The goal of treatment is to control the symptoms and prevent complications. Eventually PKD will progress and lead to end stage kidney failure. *See* Squier Affidavit, ¶ 4, docket #30-2.

Prior to his incarceration, Plaintiff had not been diagnosed with PKD. On May 19, 2010, Dr. Mahler saw Plaintiff for hematuria (blood in the urine). *Id.*; Plaintiff's medical records,

p. 188, docket #32-4. Plaintiff stated that he had been lifting weights over the weekend and that night had experienced very dark urine. Plaintiff reported feeling fine except for some soreness in his arms from lifting weights. Plaintiff reported that he was drinking fluids okay and stated that he had no increase in urination. Plaintiff had a history of hematuria with a negative work-up. *Id.*

On June 16, 2010, Plaintiff was seen by Dr. Mahler, who noted that Plaintiff had an elevated kidney function test, but no history of kidney problems, although Plaintiff did have a strong family history of PKD. Plaintiff denied hematuria, difficulty urinating, or back or flank pain. Dr. Mahler noted recent abnormal lab tests, which could indicate stage III kidney disease. Dr. Mahler requested a kidney ultrasound. Plaintiff's medical records at pp. 185-186; Squier Affidavit, ¶ 9. On June 24, 2010, Dr. Ralles noted that Plaintiff continued to have abnormal blood work and scheduled Plaintiff to start medication for hypertension. Plaintiff's medical records at pp. 9, 184; Squier Affidavit, ¶ 10. Plaintiff refused medication, stating that he could not swallow pills. *Id.* at p. 183.

On July 13, 2010, Plaintiff's ultrasound showed that he was suffering from PKD and Dr. Mahler contacted Defendant Squier on July 14, 2010. Defendant Squier recommended observation and initiation of ACE-1 therapy to protect remaining kidney function. Dr. Mahler planned to start Plaintiff on Vasotec 10 mg daily watch his kidney function. *Id.* at p. 181. On July 21, 2010, Plaintiff was informed of his diagnosis and recommended treatment. Plaintiff stated that he was unable to swallow pills and that he gags and vomits if the pills are crushed. Dr. Mahler noted that she would check into liquid medication for Plaintiff, but Plaintiff agreed to try the pills to see if he could tolerate them. *Id.* at p. 180. On October 1, 2010, Mary A. Roose, R.N., saw Plaintiff for complaints of a sore throat. Plaintiff's blood pressure was elevated and he reported that he was not taking the Vasotec. Roose educated Plaintiff regarding the need to take the Vasotec and

to have his blood pressure checked. Plaintiff agreed to try crushing his pill and placing it in a small amount of food or water. *Id.* at p. 176.

On October 6, 2010, Plaintiff was seen by nutritionist Kelly M. Wellman, who instructed Plaintiff on ways to reduce the sodium in his diet, and encouraged him to consume adequate fluids and continue taking his medications. Wellman noted that Plaintiff might need a 2 gm sodium diet if his blood pressure remained elevated. *Id.* at p. 175. On November 10, 2010, Dr. Ralles noted that Plaintiff's lab results were worsening, that he had been scheduled to see the medical provider, and that he might need a 24-hour urine study. *Id.* at p. 174. On November 16, 2010, Defendant Asche examined Plaintiff and noted that he was complaining of two to three episodes of sharp anterior abdominal pain per week, which did not appear to be related to an impending bowel movement. Defendant Asche order lab tests and scheduled Plaintiff for a follow-up appointment. *Id.* at pp. 172-73.

On November 24, 2010, Defendant Asche saw Plaintiff, who was asymptomatic, for a 10 minute counseling appointment and noted that his serum creatinine levels were slightly improved. Plaintiff indicated that he was taking his medication daily and voiced understanding of his low sodium diet. Defendant Asche planned to switch Plaintiff's blood pressure medication to a calcium channel blocker. *Id*. at pp. 170-71. On January 20, 2011, Plaintiff was seen by Dr. Ralles, who examined Plaintiff, noted that he was asymptomatic, and ordered that Plaintiff be continued on his medication. Dr. Ralles also noted that Plaintiff was scheduled for lab tests in March to assess his kidney function. *Id.* at pp. 167-68. On March 14, 2011, Defendant Asche saw Plaintiff to discuss his lab results. Plaintiff did not complain of any symptoms. Defendant Asche modified Plaintiff's medication dosage. *Id.* at pp. 163-64.

On March 25, 2011, Plaintiff complained of edema in his ankles, especially after activity. Aaron F. Jeffrey noted edema in both of Plaintiff's ankles and referred Plaintiff to Defendant Asche. *Id.* at pp. 161-62. On March 28, 2011, Defendant Asche saw Plaintiff at noon, noted no edema, and planned to re-examine Plaintiff in the late afternoon. *Id.* at p. 159. On March 29, 2011, Defendant Asche noted moderate edema and prescribed HCTZ 25 mg daily to begin on April 1, 2011. Defendant Asche also scheduled Plaintiff to have lab tests in early April and early May of 2011. *Id.* at p. 158. On April 19, 2011, Defendant Asche noted no edema and scheduled Plaintiff for lab tests on May 5, 2011. *Id.* at pp. 153-54. On May 13, 2011, Plaintiff complained of feeling dizzy upon standing and was scheduled for weekly blood pressure checks. *Id.* at p. 150.

On June 15, 2011, Plaintiff was seen by a nurse after he complained of rust colored urine. Plaintiff was instructed to drink plenty of fluids and to contact health services immediately if he experienced abdominal pain or difficulty in voiding. *Id.* at p. 2. On July 21, 2011, Plaintiff was seen by Defendant Asche for a chronic care visit. Plaintiff stated that he had stopped taking the Norvasc, and was no longer having dizziness. Defendant Asche did not resume the Norvasc. Plaintiff continued to take the HCTZ. Defendant Asche advised Plaintiff to walk for exercise rather than run as that might be contributing to his rising creatinine levels. Defendant Asche scheduled lab tests and a chronic care visit in October. *Id.* at pp. 146-48.

On August 3, 2011, Defendant Asche requested a nephrologist consult because of Plaintiff's lab results. The request was approved on August 4, 2011. On August 12, 2011, Plaintiff had a tele-med conference with Dr. Dye, a nephrologist. Dr. Dye interviewed Plaintiff regarding his history and symptoms and recommended a 24-hour urine collection to check kidney function. Dr. Dye also recommended a head CT to check for aneurysms because of the high risk of that condition with PKD patients. Dr. Dye requested a follow-up with Plaintiff in one month in order to evaluate

whether he should have surgery to place an AV fistula in preparation for dialysis. Defendant Wilbanks subsequently arranged for a 24-hour urine collection. *Id.* at pp. 132-36.

On September 12, 2011, Defendant Asche reviewed Plaintiff's lab results and submitted requests for Plaintiff to have a head CT, a nephrologist visit, and a surgical consult. *Id.* at p. 131. On September 16, 2011, Defendant Squier approved the nephrologist visit, but deferred the request for a surgical consult. Defendant Squier noted that onsite service providers should continue to monitor renal function and that a consult could be requested when dialysis appeared to be more imminent. Defendant Squier consulted a current medical literature aneurysm repair and found that in the absence of symptoms or a strong family history of aneurysm or rupture, routine screening is not recommended in patients with polycystic kidney disease because treatment of asymptomatic aneurysms is associated with considerable morbidity. Defendant Squier noted that Plaintiff would be at a high risk of death if the provider attempted to repair any asymptomatic aneurysms. Defendant Squier concluded that it would be best to leave the situation alone unless Plaintiff developed symptoms. *Id.* at pp. 117-122.

On September 20, 2011, Defendant Asche saw Plaintiff regarding blood in his urine on September 16, 2011. Plaintiff stated that his urine had now returned to its normal color. Defendant Asche did not believe that the transient hematuria had any clinical significance, but told Plaintiff to describe it to the nephrologist at his scheduled consultation. Defendant Asche described Defendant Squier's recommendations to Plaintiff on September 27, 2011. *Id.* at pp. 113-116. On October 14, 2011, Plaintiff saw Dr. Dye in a tele-med conference. Dr. Dye noted that Plaintiff was at stage IV kidney disease and recommended that Plaintiff have vascular surgery for the creation of an AV fistula, because such an action would allow the access to mature and avoid the added expense of having a catheter placed for dialysis management. Defendant Asche reviewed the

recommendation and forwarded the request. *Id.* at pp. 107-110. On October 25, 2011, Defendant Asche noted that Plaintiff's serum creatinine had improved and that Plaintiff would be followed by the MDOC nephrologist. *Id.* at pp. 102-04.

On November 7, 2011, Dr. Adam Edelman recommended that the onsite provider continue to monitor Plaintiff and that, when necessary, the AV fistula would be authorized. *Id.* at pp. 98-99. On November 9, 2011, Defendant Wilbanks noted that Dr. Asche would be conducting lab monitoring on Plaintiff every two months. *Id.* at p. 97. On December 5, 2011, Defendant Asche saw Plaintiff for testicular pain and abdominal pain, although Plaintiff was asymptomatic at the time of the examination. Defendant Asche noted diffuse mild direct abdominal tenderness with no guarding, mass or rebound. Defendant Asche placed Plaintiff on Senna for constipation. Defendant Asche planned for watchful waiting as regards to testicular issues since the exam was normal. *Id.* at pp. 92-93.

On December 29, 2011, Defendant Asche met with Plaintiff and discussed his lab results, which had remained stable compared to October 6, 2011. Although Plaintiff was having hyperuricemia, it did not necessitate action because he had not been having gout attacks or stones. On January 12, 2012, Defendant Asche noted that Plaintiff's lab results had remained stable for the past four months. Additional tests were ordered for February 9, 2012. *Id.* at pp. 86-90. On January 29, 2012, Kelly Wellman provided Plaintiff education on appropriate diet choices and noted that additional diet restriction may be required in the future as PKD is a progressive condition. *Id.* at p. 85. On February 22, 2012, Wellman noted that Plaintiff's lab results had worsened and recommended that Plaintiff be transferred to a diet-line facility for therapeutic diet. *Id.* at p. 81.

On February 27, 2012, Plaintiff was transferred to the Marquette Branch Prison (MBP) for a diet-line. On March 22, Plaintiff told R.N. Cheneworth that he should be in DWH

because he had polycystic diagnosis. Plaintiff reported that he had been placed on a 2 gm sodium and 70 gm protein diet, that he had 17% kidney function and that he experience dizziness when standing and walking. Plaintiff was referred to Physician's Assistant Kocha for further evaluation. *Id.* at pp. 71-77. On March 29, 2012, Plaintiff had a very high uric acid level. Kocha scheduled Plaintiff for a uric acid recheck in one week. *Id.* at p. 72. On April 2, 2012, Kocha saw Plaintiff, who stated that he had changed his diet for the better. Kocha noted that he was not yet approved for an AV fistula and ordered repeat lab tests. Kocha also discontinued the HCTZ due to Plaintiff's dizziness. *Id.* at p. 70.

On April 10, 2012, Kocha saw Plaintiff and noted that his dizziness was improving, his blood pressure was in decent control, and that although Plaintiff's weight was up, he did not have edema. *Id.* at pp. 67-68. On April 30, 2012, Kocha saw Plaintiff, who complained of increased pain in his kidneys and weight gain. Plaintiff denied dizziness or swelling in extremities or abdomen. Kocha prescribed Chlorthalidone, advised Plaintiff of the side-effects, and warned Plaintiff to stop taking the medication if he experienced severe dizziness. *Id.* at pp. 65-66. On May 23, 2012, Kocha saw Plaintiff and noted that the Chlorthalidone was not working. Kocha discontinued the Chlorthalidone and started Plaintiff on Lasix. Plaintiff was prescribed TED hose and lab tests were scheduled in two weeks. *Id.* at 63-64. On June 5, 2012, Kocha increased Plaintiff's Lasix dosage due to the fact that Plaintiff still had a trace of bilateral lower extremity edema. *Id.* at pp. 58-59. On June 13, Kocha saw Plaintiff and noted that the Lasix was working. Plaintiff was told that if he began to experience dizziness, he could decrease the dosage of his Lasix to 40 mg per day. *Id.* at pp. 60-61.

On June 20, 2012, Kocha saw Plaintiff for a complaint of swelling in his big toe. However, the swelling was gone as of the appointment although the joint was slightly erythematous.

Kocha concluded that Plaintiff had a resolving gout attack from the Lasix and planned to start Plaintiff on Allopurinol if he developed any additional gouty symptoms. Kocha also planned to prescribe Plaintiff glucocorticoids if he suffered another gout attack. *Id.* at pp. 55-56. On June 27, 2012, Kocha saw Plaintiff, who stated that he was feeling fine. No changes in Plaintiff's treatment were made at that time. *Id.* at pp. 52-53. On July 6, 2012, Kocha noted that although Plaintiff had been scheduled for an appointment to address pain in his feet, Plaintiff did not show up for his appointment, but instead went to work. Kocha assumed that Plaintiff was feeling better. *Id.* at pp. 50-51.

On July 9, 2012, Kocha reviewed Plaintiff's chart and noted lab results. On July 10, 2012, Kocha saw Plaintiff for tenderness and pain in feet. Plaintiff reported no swelling in his legs, but Kocha noted trace edema in Plaintiff's ankles. Plaintiff was stable on Lasix. Because Plaintiff's uric acid level had dropped, Kocha discussed the case with a physician and decided to wait to start Plaintiff on Allopurinol. *Id.* at pp. 46-49. On August 16, 2012, Kocha saw Plaintiff, who denied dizziness, chest pain, or shortness of breath. Plaintiff reported that he had been eating junk food at his kitchen job and that the pain in his left foot was bad, and that he also had pain in his right foot to a lesser extent. Kocha noted that Plaintiff had gout and told Plaintiff to stop eating junk food. Additional lab tests were ordered, as were a short burst of steroids. *Id.* at pp. 41-43.

On August 20, 2012, Kocha renewed Plaintiff's diet order, reviewed his labs, and planned to address Plaintiff's decreasing calcium levels and his increasing thyroid levels in a month. *Id.* at pp. 36-38. On September 19, 2012, Kocha saw Plaintiff, who reported a flare of gout. Kocha restarted the prednisone and noted a plan to start Plaintiff on calcium carbonate and Vitamin D. The Regional Medical Officer approved the Vitamin D request for Plaintiff on September 20, 2012. *Id.* at pp. 30-34. On October 16, 2012, Kocha advised Plaintiff to stay on the diet tray line. *Id.* at p. 24.

On October 18, 2012, Kocha saw Plaintiff and noted that the PKD was stable. Plaintiff agreed to increase exercise and avoid junk food. *Id.* at pp. 27-28. On December 10, 2012, Kocha reviewed Plaintiff's chart to evaluate his lab work and scheduled Plaintiff for follow-up. Kocha noted that it was time to discuss dialysis. On December 11, 2012, Kocha noted that Plaintiff's last set of labs indicated that he should be evaluated for dialysis. Kocha ordered additional labs in two weeks and increased Plaintiff's Lasix dosage. *Id.* at pp. 16-21. On December 12, 2012, Defendant Squier approved an appointment for dialysis evaluation. *Id.* at pp. 15, 19-20.

Defendant Squier attests that her decision regarding Plaintiff's medical treatment was based on the fact that AV fistulas have a limited life expectancy, only 50% of them are patent in five years. It takes 1 to 4 months for the fistula to mature and be ready for use. Defendant Squier did not want to put in a fistula and then have it clot or be damaged before it could be used. Defendant Squier explained that she was engaging in a balancing act to place the fistula soon enough that it might be used for dialysis, but not so soon that it would be damaged before it could be used. If urgent dialysis is needed it can be performed through a catheter while a fistula is put in or is still maturing in preparation for use. On January 15, 2013, Defendant Squier authorized surgery to install the fistula. Plaintiff is seeing Dr. Dye once a month via tele-med to monitor his condition. *See* Defendant' Squier's affidavit, ¶ 65.

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). It is clear from the record in this case that Plaintiff received adequate medical care and that his complaint is merely over the specific course of this treatment. The fact that Plaintiff did not receive an AV fistula at an earlier date does not rise to the level of an Eighth Amendment violation. This case is factually

distinguishable from the situation in *Moore v. Cheatham, et al.*, No. 13-1299 (6th Cir. Jan. 13, 2014), which was recently addressed by the Sixth Circuit. In *Moore*, the plaintiff, a prisoner, suffered from a hydrocele for a number of years and was treated mainly with an order for "scrotal support." On December 1, 2008, Moore was taken to an off-site emergency room and then another hospital with a painful and swollen testicle. A urologist noted that Moore had an immense hydrocele and ordered medication to treat his pain and fever. The urologist advised the prison that he could perform a hydrocele repair when Moore's fever was gone. Moore was then returned to the prison. Moore's medical records show that he was seen by a nurse on December 3, 2008, and again on December 8, 2008, and that he was given pain medication and antibiotics as ordered by the doctor. On December 10, 2008, Moore was seen by a doctor who found that his hydrocele was "larger than a grapefruit." Moore was then sent to the hospital, where the inpatient review report stated that Plaintiff's left hemi-scrotum was the size of a volleyball. On December 11, 2008, Moore underwent surgery to repair the hydrocele. In reversing the district court's grant of summary judgment, the Sixth Circuit noted that a testicle swollen to the size of a volleyball, or even a grapefruit, is obviously a condition requiring the attention of a physician. The Sixth Circuit stated:

> The defendants do not suggest that they were unaware of the doctor's orders or of Moore's pain and requests for health services. Given the severity of Moore's condition, a refusal to provide medication and timely treatment could lead a reasonable trier of fact to conclude that prison officials exposed Moore to "undue suffering or the threat of tangible residual injury." *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976); *see also Scott v. Ambani*, 577 F.3d 642, 648 (6th Cir. 2009).

*Moore v. Cheatham*, No. 13-1299 (6th Cir. Jan. 13, 2014).

As noted above, Defendants' issue regarding placement of an AV fistula was the timing of such a placement. Both Plaintiff's medical record and Defendants' affidavits show that

there were legitimate medical reasons for waiting on the placement of the AV fistula. As noted by Defendant Squier, she was engaged in a balancing act to place the fistula soon enough that it might be used for dialysis, but not so soon that it would be damaged before it could be used. In addition, if urgent dialysis was necessary it could be performed through a catheter while a fistula is put in or is still maturing in preparation for use. Finally, there is no indication that the delay in placement of the AV fistula caused Plaintiff any additional suffering. Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). Therefore, the court concludes that Defendants are entitled to summary judgment.

In addition, Defendant Wilbanks claims that she is entitled to qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise

power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id*. As noted above, Defendants did not violate Plaintiff's constitutional rights. Accordingly, they are entitled to qualified immunity.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' motions for summary judgment. Accordingly, it is recommended that Defendants' motions for summary judgment (Docket #27 and #30) be granted and this case be dismissed in its entirety. Finally, the undersigned notes that although Defendant Dye has not filed a motion for summary judgment in this case, for the reasons stated above, she is also entitled to summary judgment in this action.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from

proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

        NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).

        /s/ Timothy P. Greeley  
        TIMOTHY P. GREELEY  
        UNITED STATES MAGISTRATE JUDGE

Dated:   January 16, 2014